# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

JENNETTE WESTFALL,                    :

     Plaintiff,                       :
                    Case No. 3:12cv00293

 vs.                                  :
                   District Judge Thomas M. Rose
CAROLYN W. COLVIN,                    :    Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,              :

     Defendant.                       :

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.    <u>Introduction</u>

Plaintiff Jennette Westfall brings this case challenging the Social Security Administration's denial of her applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB).  Plaintiff protectively filed[2] her SSI and DIB applications on March 28, 2008, asserting that she has been under a "disability" since August 10, 2006.  (*PageID##* 172-176, 177-183).  Plaintiff rearended a garbage truck on

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

[2] A protective filing date is the date a claimant first contacted the Social Security Administration about filing for disability benefits.  It may be used to establish an earlier application date than when the Social Security Administration received the claimant's signed application.  *See* http://www.ssa.gov/glossary.

her way to work on a foggy morning in March 2006.  (*PageID#* 325).   Plaintiff claims to be disabled due to a neck injury and herniated disc.

After various administrative proceedings, Administrative Law Judge (ALJ) Carol Bowen denied Plaintiff's applications based on her conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act.  (*PageID##* 65-76).  The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration.  This Court has jurisdiction to review the administrative denial of her applications.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

The case is before the Court upon Plaintiff's Statement of Errors (Doc. # 8), the Commissioner's Memorandum in Opposition (Doc. # 11), Plaintiff's Reply (Doc. # 12), the administrative record (Doc. # 6), and the record as a whole.

## II.   Background

### A.   Plaintiff's Vocational Profile and Testimony

Plaintiff was 35 years old on her alleged disability onset date, which defined her as a "younger individual" for purposes of resolving her DIB and SSI claims.  *See* 20 C.F.R. §§ 404.1563(c); 416.963(c)[3]; (*PageID#* 75).

---

[3] The remaining citations will identify the pertinent DIB Regulations with full knowledge of the corresponding SSI/DIB Regulations.

2

Plaintiff has her GED, and previously worked as a kennel manager at a pet store. (*PageID## 87-88*).  She believes they fired her because she could not do the job anymore. (*Id.*).  She stated, "I couldn't perform like I did before the accident.  I couldn't move as fast as they required to have things done.  I couldn't lift anymore.  Of course, I could lift the Chihuahua and that, but when it came to the bigger puppies, I couldn't lift them anymore and I was on heavy medication so my – I don't know how to explain that.  I don't know the word for that.  I wasn't – my mind wasn't set the way it should be." (*PageID# 89*).  Plaintiff testified she still experiences problems with her memory.  She stated she cannot concentrate for very long.  (*Id.*).  Plaintiff testified she experiences pain in her neck, thoracic spine, shoulders, and knees.  She stated that if she did not take medications, her pain level would be a 10 out of 10.  With the medication, her pain level "on any ordinary given day" is about a six or a seven, however, when it is rainy or cold outside it is "usually around an eight or nine."  (*PageID# 92*).

Plaintiff testified that she cannot do all of the household chores in one day, rather, she has to "break them up and do them through the week."  (*PageID# 93*).  She stated she is not able to carry her 11 month-old grandson, although she can hold him while sitting down.  (*Id.*).  Plaintiff stated she has good days and bad days, but more bad days than good days.  (*PageID# 94*).  She testified that on a "good" day, she will do her grocery shopping and any other "house shopping things" she needs to do that day.  (*Id.*).  However, she will almost always go shopping with someone who can help her with carrying items and placing items in her cart.  (*PageID# 95*).  She testified that on a "bad"

3

day, she does not get much done, except perhaps look at a magazine.  She stated she usually has two or three good days per week.  (*PageID#* 94).  Plaintiff testified she is able to fix meals for herself, although she will sometimes need help from her children. (*PageID#* 95).  She testified she does not have any trouble with dressing or bathing, and likes to read novels for a hobby.  (*PageID##* 95-96).  She stated she has a computer at home but does not use it very much because she is unable to sit very long with her neck in one position.  (*PageID#* 96).  She also stated she does not sleep well at night (only sleeps for about four to six hours), and takes a 30 to 45 minute nap during the day.  (*PageID#* 96).  She testified she is not able to go to the movies, but sometimes can go out to eat with her husband.  She sees family or friends about three or four times a month, but is not involved in any groups or clubs.  She can walk for about an hour, with breaks, before it is uncomfortable.  (*PageID#* 97).  Plaintiff stated she can lift a milk jug, but is unable to bend her right wrist back or forward all the way.  (*PageID#* 99).  She is not able to open jars or bottles.  (*PageID#* 101). She believes the longest she can stand before she needs to sit down would be for 20 minutes.  (*PageID#* 98).

### B.  Medical Opinions

Plaintiff was involved in a car accident, in which she rearended a garbage truck, on March 29, 2006.  (*PageID#* 325).  After the accident, she experienced pain in numerous parts of her body, but primarily in her thoracic and lower cervical region.  (*PageID#* 328).

### 1.  Carl Wooldridge, D.O.

4

Dr. Woolridge, an orthopedist, treated Plaintiff for her knee and shoulder pain from November 15, 2006 through April 26, 2007.  In November 2006, Dr. Woolridge started Plaintiff on acquatic exercises to try to develop her knee, and advised her to avoid stairs as much as she can.  He advised her to return again in six weeks.  Upon her next visit on January 10, 2007, Dr. Woolridge noted that Plaintiff "has a very difficult time doing exercises on her left knee because of the amount of discomfort.  She has a difficult [time] getting from a standing position."  (*PageID#* 255).  He ordered an MRI of her left knee (with attention to the patellofemoral joint) and also of her right shoulder (with attention to the rotator cuff).  He noted that "if either one shows pathology, we will talk about arthroscopy of either or both joints."  (*Id.*).

After the MRIs were performed, Plaintiff returned for a follow up visit.  Dr. Wooldrige initially believed there was a rotator cuff tear, but after a positive response to injections later changed his opinion.  (*PageID#* 254).  As to the MRI of Plaintiff's knee, Dr. Woolridge stated that the "MRI shows a tear of the ACL," and advised that Plaintiff "needs to seriously consider arthroscopy of the knee."  (*Id.*).  Plaintiff underwent a left knee arthroscopy and debridement on January 24, 2007, which showed "Grade 2 degenerative arthritis medial condyle, plica, and grade 2 degenerative arthritis patellofemoral joint," but no tear.  (*PageID#* 261).  Plaintiff's left knee pain continued.  (*PageID#* 253).  By April 2007, Plaintiff experienced some improvement in her left knee pain, but she still had clutching and clicking on examination.  (*PageID#* 252).  She underwent a left knee Supartz injection on April 26, 2007.  (*PageID##* 251, 524).

5

### 2.    Lynn Robbins, M.D.

Dr. Lynn Robbins, a neurologist, treated Plaintiff from March 29, 2006 through February 5, 2008.  A cervical MRI performed April 19, 2006, showed a small annular tear at C4-5, an annular tear at C5-6 with a moderate left paracentral disc protrusion that caused moderate foraminal narrowing, and a small annular tear at C6-7 with a slight posterior disc protrusion.  (*PageID#* 323).  A cervical MRI performed May 17, 2006, showed no significant change from her MRI performed in April.  (*PageID#* 316).  On June 27, 2006, Plaintiff visited the emergency room due to neck pain.  (*PageID#* 315).  During an examination on October 24, 2006, it was noted that Plaintiff had a very limited range of motion of her cervical spine, decreased deep tendon reflexes for her upper and lower extremities, and some sensory changes.  (*PageID#* 310).  A three level cervical fusion was recommended.  (*Id.*).  The cervical fusion was performed on October 25, 2006.  (*PageID#* 302).

In February 2007, Dr. Robbins observed that Plaintiff walked slowly, but had gross strength at 5/5.  (*PageID#* 347).  Plaintiff later reported to Dr. Robbins that her neck pain was improving since taking prescription medications Neurontin and Flexiril.  (*PageID#* 344).  Plaintiff's cervical spine x-rays in February 2007 showed post fixation at C4 through C7 with adequate alignment (*PageID#* 74), and a MRI of the lumbosacral spine showed only "mild" degenerative disk disease with a "very minimal" disk bulge at L4-5.  (*PageID#* 345).  Plaintiff underwent physical therapy but reported experiencing only some improvement in her pain.  (*PageID#* 340).

6

A July 10, 2007 EMG of her left upper extremity was normal.  (*PageID#* 337).  A cervical MRI demonstrated only "a small disc protrusion above the level of surgery at C3-4."  (*PageID#* 339).  Physical therapy was recommended for pain management for her neck pain in October 2007, but again she did not make much progress.  (*PageID#* 335-36).

A January 7, 2008 lumbar MRI showed similar results to her previous lumbar MRI.  (*PageID#* 333).  Her January 28, 2008 cervical MRI revealed status post fusion and possible "cord abutment at the  C4-C5 level . . . ." (*PageID#* 331).  A thoracic spine MRI, on that date, showed a "[f]airly large disc herniation at T6-T7 and may mildly impress upon but does not compress the thoracic cord" with a "[s]maller leftward disc herniation at T5-T6."  (*PageID#* 330).  She was referred to Dr. Charles Kuntz for her thoracic spine problems.  (*PageID#* 329).

### 3. University of Cincinnati - Mayfield Clinic Neurological Surgery Clinic - Charles Kuntz, M.D./George Mandybur, M.D./Sairam Alturi, M.D.

In April 2008, Plaintiff saw another neurosurgeon, Dr. Kuntz.  He did not have the MRIs to review at this time, so he saw her again on May 27, 2008.  (*PageID#* 352).  Dr. Kuntz concluded that, based on an examination of Plaintiff and a review of her MRI scans, additional surgery would not help her pain significantly and recommended a morphine pump.  (*PageID#* 415).

During an exam on July 25, 2008 with Dr. Mandybur, Plaintiff had significant muscle spasm, tenderness on palpation, and hyporeflexic.  (*PageID#* 442).  Dr. Mandybur

7

did not recommend an implantable morphine pump because it "would not address the patient's cervical pain nor any upper extremity symptoms at this time." (*PageID#* 444). He also did not think that a spinal cord stimulator was advisable. (*Id.*). It was recommended that she have another round of therapeutic injections and possible chiropractic maneuvers. (*PageID#* 443). She underwent bilateral medial branch blocks for her cervical spondylosis in December 2008 with no long term improvement. (*PageID#* 498).

Dr. Atulri gave Plaintiff radiofrequency treatments on December 30, 2008, July 28, 2009, and October 27, 2009. (*PageID#* 558, 563-64). On January 26, 2009, she reported a fifty percent improvement on her left but no improvement on her right. She had significant tenderness on exam. (*PageID#* 565). She also had a cervical epidural steroid injection. (*PageID#* 559). She experienced some improvement in her upper neck but not in her lower neck. (*PageID#* 567). She had a facet joint injection on May and June 2009. (*PageID#* 560-61). She had a diagnostic block on July 16, 2009. (*PageID#* 562). On October 21, 2009, she reported two months of good relief from the radiofrequency treatment. (*PageID#* 568).

### 4. Carlos Menendez, M.D.

Plaintiff relies on the opinions of her treating physician, Dr. Carlos Menendez. Plaintiff started treating with Dr. Menendez on August 28, 2006, for migraines, dizziness, tinnitus, neck pain, and right knee pain. (*PageID##* 68, 366-414, 447-71, 569-609). Plaintiff saw Dr. Menendez due to neck pain on October 4, 2006, April 16, 2007, and

May 23, 2008.  In addition to prescription medication, Plaintiff also received injections. (*PageID#* 369, 373,-75, 379, 388-89).  It was noted that she had knee surgery for an ACL tear in February 2007.  (*PageID#* 382).  Dr. Menendez reported on February 8, 2008, that Plaintiff's cervical MRI showed a herniated disc.  (*PageID#* 374).  On May 23, 2008, Dr. Menendez reported that Plaintiff had severe neck and chest pain, and that such pain was consistent with her physical findings.  She experienced significant muscle spasms to her paracervical muscles and her cervical spine range of motion was restricted on all planes. Her gait was normal.  (*PageID#* 367).

On October 1, 2008, he reported that she had osteoarthritis and depression. (*PageID#* 449).  Dr. Menendez opined that Plaintiff was unable to sit or stand longer than fifteen minutes without interruption; could not look up or down; could not lift/carry more than ten minutes; could not stoop, climb, or bend; and had poor concentration and memory and was unable to deal with work stress.  (*PageID#* 450).  She was seen for neck pain on August 13, 2008.  She was treated with a Toradol injection and a Fentanyl patch. (*PageID#* 455-56).  It was noted that she had a morphine pump inserted, but did not experience any improvement.  (*PageID#* 455).  She was also treated, on October 1, 2008, for major depression, as well as given a Toradol injection for her pain.  (*PageID#* 454). On exam, she had "intense paracervical spasm," crepitus, tenderness, and effusion. (*PageID#* 453).

Plaintiff saw Dr. Menendez through January 6, 2010.  On December 26, 2008, she was observed to be trembling and was seen for the tremors.  (*PageID#* 581).  Plaintiff was

seen on February 18, 2009, for increased neck pain.  She had tenderness over her cervical spine and muscle spasms.  She also was observed to be depressed.  (*PageID#* 579).  She was observed to be in severe pain on July 16, 2009.  She was seen for leg pain and she had tenderness over her lower lumbar spine.  (*PageID#* 577).  She was seen for bilateral wrist pain on October 7, 2009.  She had tenderness of her right wrist and some atrophy of her right thenar eminence.  She was given a wrist splint.  (*PageID#* 575).  On December 4, 2009, she was seen for increased neck pain, owing to a fall down the stairs.  (*PageID#* 573).  Dr. Menendez stated, "Medical history that may be a contributing factor to depression includes chronic disability."  (*PageID#* 583).  She was depressed and tearful. (*Id.*).  She had crepitus, tenderness of the lower lumbar spine, and effusion.  (*Id.*). Plaintiff was also treated for lumbar radiculopathy.  (*PageID#* 573-74).  She was treated for venous stasis for December 2009 and January 2010.  (*PageID#* 569, 571).  On exams, Plaintiff had edema.  (*PageID#* 569, 571).  Dr. Menendez opined that Plaintiff was permanently disabled on December 29, 2008.  (*PageID#* 592).  On February 24, 2009, Dr. Menendez opined that Plaintiff had chronic pain and disability and her condition was permanent; her neck had reached maximal medical benefit; and she would need future physical therapy and epidural blocks.  He noted she also had a herniated disc that might need future surgical intervention.  (*PageID#* 590).

### 5.  **Maria Congbalay, M.D./Edmond Gardner, M.D.**

Non-examining physician, Dr. Maria Congbalay, reviewed the record on April 14, 2008.  (*PageID#* 424).  She noted that Plaintiff could occasionally lift/carry up to twenty

10

pounds and frequently lift/carry up to ten pounds.  She could stand/walk for six hours and sit for six hours out of eight.  (*PageID#* 418).  She was never to climb ladders, ropes, or scaffolds, but could occasionally stoop.  (*PageID#* 419).  She was limited to occasional reaching in all directions.  (*PageID#* 420).  She had unlimited push/pull abilities.  (*Id.*).

Dr. Edmond Gardner, another non-examining physician, reviewed the record on January 29, 2009, at the request of the State agency.  He affirmed the previous assessment provided by Dr. Congbalay.  (*PageID#* 502).

### 6.  Dennis J. Schneider, Ed.D.

Psychologist Dr. Dennis Schneider evaluated Plaintiff on July 22, 2008 at the request of Dr. George Mandybur, M.D.  (*PageID#* 425).  He was assessing her psychological suitability to have a morphine pump implanted.  (*Id.*).  Dr. Schneider opined that "It is my opinion that her current psychological distress is in reaction to her continuing pain problems and to her physical limitations."  (*PageID#* 427).

### 7.  Elizabeth Simmons, LPCC

Plaintiff was first seen by Ms. Simmons, a mental health therapist, on April 18, 2008.  Plaintiff had symptoms of "anhedonia . . ., anxious mood, insomnia, decreased ability to concentrate, fatigue, guilty, feelings of worthlessness and tendency towards indecisiveness."  (*PageID#* 526).  The diagnosis was major depression, single episode, moderate.  (*PageID#* 526).  She was treated with individual psychotherapy, behavior modification, and solution oriented therapy.  (*PageID#* 526, 528, 530-35).  Plaintiff was observed to have distorted thinking.  (*PageID#* 536-557).

11

Ms. Simmons completed a Daily Activities Questionnaire on October 30, 2008. She noted that Plaintiff has consistently attended scheduled sessions (approximately two sessions per month), and has only had one cancellation.  She reported Plaintiff could relate to others; was limited in her ability to lift and bend; tired and experienced pain frequently; had a slow pace; was capable of maintaining personal hygiene; could shop but needed frequent breaks to rest; could drive, bank, and pay bills; and had limited hobbies due to physical difficulties.  (*PageID#* 481).

### 8.    **David Demuth, M.D.**

Dr. Demuth, a non-examining psychiatrist, reviewed the record on November 11, 2008.  (*PageID#* 482).  He opined that Plaintiff had a mild impairment in her daily activities and a mild impairment in her ability to maintain concentration, persistence, or pace.  (*PageID#* 492).  A severe psychological impairment was not established. (*PageID#* 494).

### C.    <u>**Vocational Expert Testimony**</u>

In addition to Plaintiff, a vocational expert (VE) testified at the administrative hearing.  The VE classified Plaintiff's past work as a horse trainer (medium and unskilled), a veterinary technician (medium and skilled), and a landscape laborer (heavy and unskilled).  (*PageID##* 103-04).

The VE was asked to consider an individual with the same age, education, and work experience as Plaintiff, who is restricted to light exertional demands, and can never climb ladders, ropes, or scaffolds; can only occasionally climb ramps or stairs; can only

occasionally stoop, kneel, crouch, and crawl; can only occasionally reach overhead, bilaterally; and is not exposed to extreme cold, dampness, or humidity, nor to hazardous machinery or unprotected heights.

With those restrictions, the VE testified that such a hypothetical worker could not perform Plaintiff's past work.  (*PageID#* 104).  The VE testified that such a hypothetical worker could perform the following light jobs: cashier (with approximately 5,000 jobs in the region) and packager (about 2,000 jobs in the region).  The VE also testified that there are a total of 140,000 light, unskilled jobs in the region and the hypothetical worker could perform around 25,000 of them.  (*PageID#* 105).

The ALJ also asked the VE to consider the same hypothetical worker, but limit the worker's exertional demands to sedentary, with all the other restrictions staying the same. (*PageID#* 105).  In response, the VE testified the hypothetical worker could perform jobs such as an assembler and order clerk (each with about 1,000 jobs in the region). (*PageID#* 105).  The VE testified there are about 25,000 sedentary, unskilled jobs in the region and the hypothetical worker could perform about 8,000 of them.  (*PageID#* 105).

If the hypothetical worker also needed the option to alternate between sitting and standing, at 15-minute intervals, the VE stated light jobs available would be reduced to 4,000, but sedentary jobs available would remain unchanged.  (*PageID##* 105-06).

When cross-examined by Plaintiff's counsel, the VE testified a hypothetical individual with the above restrictions but who could only look down for a third of the workday would have trouble maintaining most sedentary work.  (*PageID#* 107).  The VE

13

also testified that an individual who is off task a third of the workday due to chronic pain would not be able to sustain full-time work at any exertional level. (*PageID#* 107). Likewise, the VE testified that an individual who is unable to maintain attendance and would be expected to be absent three times a month would also not be expected to be able to perform full-time work at any exertional level. (*PageID#* 108).

## III.  Administrative Review

### A.    "Disability" Defined

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §§ 423(a), (d), 1382c(a). The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70 (1986).

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### B.    ALJ Bowen's Decision

ALJ Bowen resolved Plaintiff's disability claim by using the five-Step

sequential evaluation procedure required by Social Security Regulations. *See PageID##* 65-76; *see also* 20 C.F.R. § 404.1520(a)(4). Her pertinent findings began at Step 2 of the sequential evaluation where she concluded that Plaintiff had the following severe impairments: degenerative disk disease of the cervical spine with residuals of spinal fusion surgery; degenerative disk disease of the thoracic spine with disk herniation; mild degenerative disk and degenerative joint disease of the lumbosacral spine; migraine headaches; and carpel tunnel syndrome. (*PageID#* 68).

The ALJ concluded at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled the criteria in the Commissioner's Listing of Impairments. (*PageID#* 72).

At Step 4, the ALJ concluded that Plaintiff retained the residual functional capacity (RFC) to perform light work, limited to unskilled jobs that afford her the opportunity to alternate between sitting and standing in 15 minute intervals, and with the following restrictions: no climbing of ladders, ropes or scaffolds; only occasional climbing of stairs or ramps; only occasional stooping, kneeling, crouching, or crawling; no repetitive neck motions; only occasional overhead reaching with the upper extremities; no more than frequent handling/fingering/feeling with the right upper extremity; limited exposure to cold, dampness, or humid environments, and no exposure to unprotected heights or hazardous machinery. (*PageID#* 72*).*

15

The ALJ concluded at Step 4 that Plaintiff is unable to perform her past relevant work. (*PageID#* 75). At Step 5, the ALJ concluded that Plaintiff could perform a significant number of jobs in the national economy. (*PageID##* 75-76).

The ALJ's findings throughout her sequential evaluation led her to ultimately conclude that Plaintiff was not under a disability and was therefore not eligible for DIB or SSI. (*PageID#* 76).

## IV.     Judicial Review

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

**V.**     **Discussion**

    **A.**     **The Plaintiff's Contentions**

Plaintiff assigns two errors in this case.  First, Plaintiff contends that the ALJ erred in rejecting the opinion of her treating physician, Dr. Carlos Menendez.  (Doc. #8, *PageID#* 623).  According to Plaintiff, the ALJ failed to cite any contrary opinion on which she based her finding that Plaintiff had the residual functional capacity to perform work activity and did not cite any medical evidence that was inconsistent with her treating physician's opinion.  (*Id.*).  Second, Plaintiff asserts that the ALJ failed to properly evaluate her credibility.  (*PageID#* 628).

    **B.**     **Medical Source Opinions**

**1.**

**Treating Medical Sources**

17

The treating physician rule, when applicable, requires the ALJ to place controlling weight on a treating physician's or treating psychologist's opinion rather than favoring the opinion of a nonexamining medical advisor or a one-time examining physician or psychologist or a medical advisor who testified before the ALJ. *Blakley,* 581 F.3d at 406 (6th Cir. 2009); *see Wilson*, 378 F.3d at 544 (6th Cir. 2004). A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and if it is not inconsistent with other substantial evidence of record. (*Id.*).

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544).

More weight is generally given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources. *See* 20 C.F.R. § 404.1527(c)(1)[4]. Yet the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight. This occurs because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in

---

[4]20 C.F.R. §§ 404.1527 and 416.927 were amended effective March 26, 2012. The provisions governing the weight to be afforded a medical opinion were previously found at 20 C.F.R. §§ 404.1527(d) and 416.927(d).

disability claims under the [Social Security] Act."  Social Security Ruling 96-6p.

Consequently, opinions of one-time examining physicians and record-reviewing

physicians are weighed under the same factors as treating physicians including

supportability, consistency, and specialization.  *See* 20 C.F.R. § 404.927(c), (e); *see also*

Ruling 96-6p at *2-*3.

### 2.

### Non-Treating Medical Sources

The Commissioner views non-treating medical sources "as highly qualified

physicians and psychologists who are experts in the evaluation of the medical issues in

disability claims under the [Social Security] Act."  Social Security Ruling 96-6p, 1996

WL 374180 at *2.  Yet the Regulations do not permit an ALJ to automatically accept (or

reject) the opinions of a non-treating medical source.  *See id.* at *2-*3.  The Regulations

explain, "In deciding whether you are disabled, we will always consider the medical

opinions in your case record together with the rest of the relevant evidence we receive."

20 C.F.R. § 404.1527(b).  To fulfill this promise, the Regulations require ALJs to

evaluate non-treating medical source opinions under the factors set forth in § 404.1527(d)

including, at a minium, the factors of supportability, consistency, and specialization.  *See*

20 C.F.R. § 404.1527(e); *see also* Ruling 96-6p at *2-*3.

C.    **Analysis**

According to Plaintiff, the ALJ erred in rejecting the opinion of her treating

physician, Dr. Menendez, because she "did not state what opinions and evidence was

19

contrary to Dr. Menendez's opinon," and "[h]er decision is not based on substantial

evidence . . . ." (*PageID#* 627). Defendant argues that "Plaintiff's contention is

meritless. The record shows that the ALJ reasonably found that Dr. Menendez's opinions

lacked support and were inconsistent with other medical evidence. The ALJ's

determination is well-supported by the record as a whole, including treatment records and

objective medical findings." (*PageID#* 642). In response, Plaintiff contends "[t]he

defendant's assertion that the ALJ reasonably relied on the opinions of the non-examining

State agency reviewers is simply post hoc rationalization and is without merit."

(*PageID#* 656).

     In the present case, the ALJ declined to apply controlling or deferential weight to

treating physician, Dr. Menendez's opinion. *See PageID#* 73. The ALJ provided Dr.

Menendez's opinion "little weight" and instead relied on the opinion of the State agency

reviewing physicians. In deciding to reject the opinion of Dr. Menendez, the ALJ

provided the following:

> [T]he conclusion of Dr. Menendez that the claimant is disabled/unemployable
> cannot be given controlling, or even deferential, weight. His opinion is
> unsupported by his own treatment notes, as well as the overall medical record.
> Rather, it appears to be based wholly on an uncritical acceptance of the claimant's
> subjective complaints. His opinion regarding mental restrictions is outside the
> scope of his expertise and is inconsistent with the opinions of both treating and
> examining mental health sources. As Dr. Menendez's medical opinion is not
> supported by the medical record and inconsistent with other medical evidence of
> record, it is afforded little weight.

(*PageID#* 73). While the ALJ concluded that Dr. Menendez's opinion is not supported

by his own treatment notes or the "overall medical record" – and appears to be based

upon Plaintiff's "subjective complaints" – she failed entirely to discuss or otherwise indicate what purported inconsistencies in the treatment notes or "overall medical record" she actually relied upon in deciding to afford this opinion "little weight."  The ALJ's conclusions do not assist with this inquiry, nor do they constitute "good reasons" for not providing Dr. Menendez's opinion controlling weight.

In addition to helping claimants understand the disposition of their case, requiring "good reasons" be provided when discounting the weight given to a treating-source opinion "also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule."  *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004).  Such reasons are required to be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9 at *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996).  In this case, the ALJ's statements that Dr. Menendez's opinion is not supported by his treatment notes and the overall medical record is ambiguous.  *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 377 (6th Cir. 2013) ("[T]he conclusion that [the treating physician's] opinions 'are not well-supported by any objective findings' is ambiguous.  One cannot determine whether the purported problem is that the opinions rely on findings that are not objective . . . , or that the findings are sufficiently objective but do not support the content of the

opinions.").  In addition to being ambiguous, the ALJ's statements do not indicate the substantial evidence that is supposedly inconsistent with Dr. Menendez's opinion.

As Plaintiff correctly notes, much of what her treating specialists reported is, in fact, consistent with Dr. Menendez's opinion.  (*PageID#* 654).  For example, records indicate "Plaintiff had significant muscle spasms, significant limitation of range of motion of her cervical spine on all planes, tenderness of her cervical spine, and decreased hand strength, decreased reflexes, crepitus of her knees, decreased range of motion of her knees, clutching and clicking of her knees, left knee instability, post-surgical knee weakness, and positive Hawkins on exams."  (*PageID#* 654) (citing *PageID##* 252, 254-55, 257, 280, 288, 310, 312, 337, 384, 442, 457, 463, 499, 565, 567-68, 577, 579). Plaintiff also underwent a cervical spinal fusion in October 2006, (*PageID#* 503-505, 510, 517), and has suffered chronic pain since.  Dr. Menendez stated in February 2009 that despite Plaintiff's neck condition reaching "maximal medical benefit from her present medications," that she "continues to suffer from chronic pain and disability from her medical conditions," and "[i]t is my opinion that her condition is permanent." (*PageID#* 590).  He also noted that her neurosurgeons believe she may still require additional surgery to correct her herniated thoracic disc.  (*Id.*).

To the extent the substantial evidence relied upon by the ALJ as being inconsistent with Dr. Menendez's opinion consists solely of the state agency reviewing physicians'

opinions, this reasoning is insufficient.[5]  *See Gayheart*, 710 F.3d at 377 ("Surely the

conflicting substantial evidence must consist of more than the medical opinions of the

nontreating and nonexamining doctors.  Otherwise the treating-physician rule would have

no practical force because the treating source's opinion would have controlling weight

only when the other sources agreed with that opinion.").

There remains the possibility, of course, that the ALJ's errors were harmless.  The

United States Court of Appeals has explained:

> We do not hesitate to remand when the Commissioner has not provided 'good
> reasons' for the weight given to a treating physician's opinion and we will
> continue remanding when we encounter opinions from ALJ's that do not
> comprehensively set forth reasons for the weight assigned to a treating physician's
> opinion.

*Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009) (quoting *Wilson*, 378 F.3d at 545).  In

*Wilson*, the United States Court of Appeals for the Sixth Circuit remanded the ALJ's

decision due to its failure to comply with the good-reason rule.  378 F.3d at 550.

Although not deciding the issue, the Court in *Wilson* nonetheless discussed the

possibility that a violation of the good-reason requirement may qualify as harmless error.

*See Wilson*, 378 F.3d at 547–48.  Specifically, *Wilson* considered three possible scenarios

that could lead the Court to a finding of harmless error.  *Id.* at 547.  First, the Court

indicated that harmless error might occur "if a treating source's opinion is so patently

deficient that the Commissioner could not possibly credit it . . ." (*Id.*).  Second, the Court

---

[5] Even if the ALJ provided "good reasons" for rejecting the opinion of Dr. Menendez and it was
supported by substantial evidence, she failed to discuss the factors set forth in § 404.1527(c), as required,
when she provided significant weight to the opinions of the state agency consultants.  *See PageID#* 72.

noted that if the ALJ's decision was "consistent with the opinion, it may be irrelevant that the ALJ did not give weight to the treating physician's opinion, and the failure to give reasons for not giving such weight is correspondingly irrelevant." (*Id.*). Finally, *Wilson* considered the possibility of a scenario "where the Commissioner has met the goal of § 1527(d)(2)-the provision of the procedural safeguard of reasons-even though she has not complied with the terms of the regulation." (*Id.*). Since *Wilson*, the Sixth Circuit has continued to conduct a harmless error analysis in cases in which the claimant asserts that the ALJ failed to comply with the good-reason requirement. *See Nelson v. Comm'r of Soc. Sec.*, 195 Fed. Appx. 462, 472 (6th Cir. 2006) (finding that even though the ALJ failed to meet the letter of the good-reason requirement, the ALJ met the goal by indirectly attacking the consistency of the medical opinions); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007) (finding that the facts did not satisfy potential harmless error justifications).

In this case, the undersigned finds that the ALJ's failure to comply with the good-reason requirement was not harmless error. The record contains no indication that Dr. Menendez's opinion, even if found to be inconsistent with portions of the record, is "so patently deficient that the Commissioner *could not possibly* credit it . . ." *Wilson*, 378 F.3d at 547 (emphasis added). Because of Dr. Menendez's status as a treating physician, the ALJ was obligated to properly justify why she rejected his opinions and reached an inconsistent conclusion.

24

Accordingly, Plaintiff's challenges to the ALJ's evaluation of the medical source opinions of record are well taken.[6]

## VI.   REMAND IS WARRANTED

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Sec'y of Health & Human Servs.,* 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming, and because the evidence of a disability is not strong while contrary evidence is weak.  *See Faucher*, 17 F.3d at 176.  Plaintiff, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of § 405(g) due to the problems previously identified.  On remand, the ALJ should be directed to: (1) re-evaluate the medical source opinions of record under the legal criteria set forth in the Commissioner's Regulations, Rulings, and as required by case

---

[6] Because of this conclusion and the resulting need to remand this case, an in-depth analysis of Plaintiff's remaining challenge to the ALJ's decision is unwarranted.

law; and (2) determine anew whether Plaintiff was under a disability and thus eligible for

DIB and/or SSI during the period in question.

Accordingly, the case should be remanded to the Commissioner and the ALJ for

further proceedings consistent with this Report and Recommendations.

## IT IS THEREFORE RECOMMENDED THAT:

1.  The Commissioner's non-disability finding be vacated;

2.  No finding be made as to whether Plaintiff Jennette Westfall was
    under a "disability" within the meaning of the Social Security Act;

3.  This case be remanded to the Commissioner and the Administrative Law
    Judge under Sentence Four of 42 U.S.C. § 405(g) for further consideration
    consistent with this Report and Recommendations; and

4.  The case be terminated on the docket of this Court.


July 16, 2013                                   _____s/ Sharon L. Ovington_____
                                                Sharon L. Ovington
                                                Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See, United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474

U.S. 140 (1985).